## EDDIE COOK

*v.*

## THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed December 21, 1898.*

1. APPEALS AND ERRORS—*abstract of record should contain examinations of jurors upon which error is assigned.* The Supreme Court will not reverse a conviction on the ground that the trial court erred in restricting the examination of proposed jurors by the accused, where only fragmentary portions of such examinations are preserved in the abstract of record.

2. EVIDENCE—*when admission of entry on hotel register is not available as error.* The admission in evidence, in a trial for manslaughter in procuring an abortion, of an entry on a hotel register, offered to show that deceased attempted to conceal her visit with the accused to the town where the abortion was procured, by registering under an assumed name, is not error, where the clerk and proprietor had already, without objection, testified to such registry.

3. INSTRUCTIONS—*when an instruction is not misleading, as assuming existence of disputed facts.* An instruction for the People, in a trial for manslaughter in procuring an abortion, which merely defines the relation of one who, not being present, advises, assists or encourages the perpetration of a crime, is not ground for reversal, although, standing alone, it might be subject to criticism in assuming the fact of a criminal operation, where other instructions for accused required proof of such fact beyond a reasonable doubt.

4. ABORTION—*evidence reviewed and held sufficient to sustain conviction for procuring an abortion.* The court reviews the evidence in this case at length, and holds it sufficient to sustain the conviction of the accused of the crime of manslaughter in procuring an abortion.

WRIT OF ERROR to the Circuit Court of Mason county; the Hon. T. N. MEHAN, Judge, presiding.

A. J. BARR, H. R. NORTHRUP, and BEACH & HODNETT, for plaintiff in error:

An expert cannot be questioned upon a hypothesis having no foundation in the case. Wharton on Evidence, sec. 452; *State* v. *Stokely,* 16 Minn. 282.

Hypothetical questions proposed to expert witnesses must be based on facts appearing in the proofs. *State* v.

*Anderson,* 10 Ore. 448; *Balley* v. *People,* 66 Ind. 94; *Lovelady* v. *State,* 14 Tex. App. 545; *Kelly* v. *Perrault,* 48 Pac. Rep. 45; *State* v. *Hanley,* 26 N.W. Rep. 397; *People* v. *Harris,* 136 N.Y. 423; *Vosburg* v. *Putney,* 80 Wis. 523; *People* v. *Vanderhoof,* 71 Mich. 158; *O'Hara* v. *Wells,* 15 N. W. Rep. 722; *Ames* v. *Blades,* 2 id. 408.

To warrant a conviction upon circumstantial evidence alone, such facts and circumstances must be shown as are consistent with the guilt of the party charged, and as cannot, upon any reasonable theory, be true and the party charged be innocent. *Marzen* v. *People,* 173 Ill. 43; *Dunn* v. *People,* 158 id. 536; *Purdy* v. *People,* 140 id. 46; *People* v. *Lambert,* 5 Mich. 367; *People* v. *Kelley,* 28 Cal. 426.

If the facts and circumstances are of such a character as to fairly permit an inference consistent with innocence they cannot be regarded as evidence to support a conviction. *People* v. *Owens,* 43 N. E. Rep. 71; *People* v. *Bennett,* 49 N. Y. 137.

In a trial upon an indictment for abortion, there being no evidence of what occurred in the house of the defendant at the time of the alleged abortion except his own statement, which disproves the abortion, the defendant should be acquitted. *People* v. *Vanzile,* 143 N. Y. 368.

A verdict in a criminal case not supported by the evidence is contrary to law. *White* v. *State,* 36 N. E. Rep. 274; *Stout* v. *State,* 78 Ind. 492.

It is error to allow a jury to infer a fact of which there is no evidence. *Saunders* v. *People,* 29 Mich. 269.

No inference of guilt can be established by showing that the party charged had the ability to commit the crime. *State* v. *Hopkins,* 50 Vt. 316; Am. Crim. Rep. 357.

A person accused of crime cannot be found guilty and imprisoned on suspicion. *Earp* v. *State,* 50 Ga. 513; *Shannon* v. *State,* 57 id. 482; *McDaniel* v. *State,* 53 id. 253.

Instructions which assume the existence of facts to be proven are erroneous. *Cannon* v. *People,* 141 Ill. 270; *Hoge* v. *People,* 117 id. 46; *Eames* v. *Blackhart,* 12 id. 195; *Sherman*

v. *Dutch*, 16 id. 286; *Hopkinson* v. *People*, 18 id. 264; *Bond* v. *People*, 39 id. 27.

An erroneous instruction is not cured by another which correctly states the rule, because it leaves the jury at liberty to select and act upon either instruction, as might best accord with their views. *Smith* v. *People*, 142 Ill. 117; *Railroad Co.* v. *Payne*, 49 id. 499; *Railroad Co.* v. *Harwood*, 80 id. 88; *Hoge* v. *People*, 117 id. 35.

E. C. AKIN, Attorney General, ANDREW L. ANDERSON, State's Attorney of Logan county, SAMUEL MURDOCK, State's Attorney of Mason county, BLINN & HARRIS, and JOHN FULLER, for the People.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

Plaintiff in error prosecutes the writ in this case to obtain a reversal of a judgment sentencing him to the penitentiary for a term of seven years, upon a conviction for manslaughter in procuring an abortion upon the person of Minnie Bennett, whereof she died. The reversal is asked for mainly on the ground of a want of sufficient evidence to sustain the verdict, and nearly all the argument is directed to that question. This necessitates a full statement of the facts.

The case was tried four times. Once the jury disagreed and three juries have found defendant guilty. The first trial was in Logan county and resulted in a verdict of guilty, after which the venue was changed to Mason county on motion of defendant, and the other trials took place there. The evidence preserved by bill of exceptions on the last trial established the following facts:

Defendant, who was thirty-five years old, became acquainted in March, 1894, at Waynesville, DeWitt county, Illinois, with Minnie Bennett, who was twenty years old. Her mother was dead and she was keeping house for her two brothers. Defendant visited her frequently up to

the time of the abortion and her consequent death, which occurred February 17, 1895. In the meantime she moved with her brothers to Maroa, in Macon county, in September, 1894, and kept house for them there. She never kept company with any man other than defendant. He seduced and debauched her, resulting in her pregnancy, before the first of December, 1894. In the latter part of December she visited a doctor at Maroa, saying that she had falling of the womb, and upon examination it was found that she did not have that trouble, but that the cervix or neck of the womb was inflamed and sensitive, with an offensive discharge of pus. This had resulted from efforts of her own to produce an abortion, which had proved a failure. The doctor applied an antiseptic by means of a plug of cotton, and about January 1, 1895, she told him that she had come around and was feeling better. It is clear that she was seeking to cover her shame by means of an abortion. Defendant was corresponding with her, and some earlier letters were kept by her, but all his letters after this time were burned by her as soon as read. On Friday afternoon, February 8, 1895, he came to Maroa and had an interview with her, and on the following Sunday, February 10, he went to Atlanta and had an interview with Dr. Frank Gardner. On the following Tuesday, February 12, she left Maroa by train on the Vandalia line, having been up to that time, to all outward appearance, in perfect health. When the train arrived at Waynesville, where defendant lived, he was at the station, and she came out on the platform and beckoned to him with her hand and went back in the car. He immediately joined her, and they rode together to Atlanta, where they arrived at 1:06 P. M. They left the train together, but the evidence does not show where they went. About four o'clock she went to a hotel,—the Coleman House,—and stayed in the sitting room until supper. Defendant came there and asked if there was a young lady stopping there, and being told that there was, went away. He came

back during supper and sat in the office. After supper she inquired for him, and they went out together after he had paid for her supper. About 7 or 7:15 P. M. they went up-stairs to the office of Dr. Gardner, and a few minutes afterward defendant went down the street alone. About an hour afterward, or about eight o'clock, defendant and Dr. Gardner held a whispered conversation behind the prescription counter in a drug store below the doctor's office. Defendant then left Atlanta and returned to Waynesville. Minnie Bennett had remained in the office of Dr. Gardner, and a little after nine o'clock he called in Dr. Morse, who found her on the operating chair. Dr. Morse examined through a speculum at the request of Dr. Gardner, and found the neck of the womb inflamed and swollen. It was discolored and injured, indicating that the efforts toward an abortion had been continued by some person other than a doctor, but the injuries did not appear to have been inflicted at that time. Dr. Morse recommended palliative treatment for the injuries, and left. She soon left the doctor's office but did not return to the Coleman House. She went to another hotel,—the Burford House,—and tried to get a room without registering, but failing in that, she registered as "Leota Stelbacher, Bloomington, Illinois." She had $20, which was an unusual amount for her, as she was entirely without means. The next morning she was very sick and frequently vomited. She ate but very little and took only a cup of tea at noon, after which she went to the railroad station and met defendant, who had returned to Atlanta. Shortly after that time defendant was seen walking with Dr. Gardner from the direction of the doctor's house toward the station. When the train arrived Minnie Bennett and defendant boarded it and went home. He left the train at Waynesville and she remained on the train to her home at Maroa, where she arrived in great pain, which she tried to relieve by bending forward. She then showed the characteristic symptoms of peritonitis.

She could hardly walk and took to her bed in great distress. The progress of the disease from that time was very rapid. The next day she suffered an abortion, and on the following Sunday, February 17, she died of purulent peritonitis, caused by infection from the injuries about the neck of the womb. At the *post mortem* the abdominal cavity was found filled with pus and the neck of the womb gangrenous and decayed. The usual method employed by physicians to produce an abortion is to insert a probe or sound in the womb and move it around for the purpose of rupturing a sac existing there. If this had been done at the doctor's office in Atlanta the poison from the neck of the womb would have been carried up on the instrument to the inside of the womb, and the result would be precisely what occurred as a matter of fact. An inflammation would be created and the poison would be carried up through the fallopian tubes into the peritoneum, causing peritonitis, which would develop within twenty-four hours.

It is persistently argued that this evidence does not even tend to sustain the verdict, and that there is nothing but an indictment and verdict, without evidence to support the judgment. The ground of this argument is, that the evidence of doctors shows that the poison might have been absorbed and carried up by the lymphatics or through the body of the womb itself. There is testimony that such a thing might have happened, but in view of all the evidence and the history of the case there is scarcely a possibility that it did so happen. The neck of the womb is at the lowest point, and the injuries were at that place where an ignorant person would reach it without effecting an entrance. At that point the drainage outward is perfect and there is no tendency to absorb, but rather to drain away and expel, so that the foreign matter would probably drain off naturally. There are two closures of the womb, and in pregnancy the upper one is closed up tight, so that it is difficult to insert any-

thing through it. If poison had been taken up either by the lymphatics or through the body of the womb the inflammation would have spread through the whole body of the womb, which was not the case. The history of the case also demonstrates the improbability of the claim made. The neck of the womb was in worse condition in December than in February. At least six weeks before the trip to Atlanta the doctor at Maroa found pus there and a very offensive condition. Yet whatever was there passed off naturally and no harm resulted, but she remained in good health. The fact, so much dwelt upon, that the *post mortem* disclosed no marks of violence on the inside of the womb has no significance, for the evidence shows that there would be no such marks. The sound is a flexible instrument with a blunt end that would not cause laceration, and if there was a failure to puncture the sac the result as to the poison would be the same. The facts and the subsequent course of events lead to the conclusion that the poison was carried up to the interior surface of the womb by an instrument within twenty-four hours before the development of peritonitis, which manifested itself the next day after the visit to Dr. Gardner's office at Atlanta.

There can be no doubt that Minnie Bennett was resolved upon an abortion, and counsel are agreed upon that question. There is as little question that she went to Atlanta for that purpose, and that the preliminary visit of defendant to Dr. Gardner was to make arrangements to that end. There was no occasion for going twenty-seven miles to find a doctor to obtain palliative treatment for the injuries she had inflicted upon herself. Her conduct at Atlanta shows that the purpose was not innocent. She secreted herself until after dark, and after the visit to the doctor's office where it is claimed the palliative treatment was given, she changed her hotel and attempted to conceal her identity by a different name. After she had been in Dr. Gardner's office an hour defend-

ant was in whispered conference with the doctor, and she was still there an hour later, when the other doctor was called in to determine what to do for the inflamed and injured parts. The calling in of the other doctor is insisted upon as evidence that the visit was innocent, but there is so much evidence to the contrary as to overcome any inference of that kind, and the fact that nothing criminal was done in his presence cannot be taken to establish the fact that it was not done during her long stay in the office. If there was nothing but palliative treatment of the external injuries to the neck of the womb the results which speedily followed would not be probable. The only conclusion reasonably consistent with the evidence is, that there was an operation to produce an abortion at Dr. Gardner's office that evening at Atlanta. It must have been understood at the preliminary visit on Sunday that the doctor would perform the operation or the journey would not have been undertaken. There is nothing substantial to indicate that he afterwards declined, but everything to prove that he did not.

The fact of the operation being established, there can be no doubt of defendant's guilt. Minnie Bennett was resolved to procure an abortion, and the conduct of both parties shows that she appealed to him as the one responsible for her condition. He arranged in advance with the doctor; took her to Atlanta; called for her after dark, and after paying her bill took her to the doctor's office; held a private conference with the doctor before going home; came back the next day, and, finding her sick and distressed, went to Dr. Gardner's house and was seen with him going toward the station and within a short distance of it. Defendant proved that on the day he went to Atlanta with Minnie Bennett his mother was in a very critical condition, and her doctor told him to go to Atlanta and get some gin for her, there being no gin in Waynesville. When he reached Atlanta he had eighteen minutes to get the gin and return on the next

train, which was time enough for the purpose. He remained in Atlanta for seven hours, and was giving his attention to Dr. Gardner and Minnie Bennett. The natural inference is, that the business which detained him and brought him back the next day was of considerable importance. His mother was in a dangerous condition the next day, and he would not be likely to leave her except on urgent business. Dr. Gardner was dead before the first trial, and Dr. Morse, who was called in, died before the last trial. The facts stated above are wholly uncontradicted, and they seem to us to leave no reasonable doubt of defendant's guilt.

Some minor objections are made to rulings of the court on the trial, and among these are complaints that the court erred in restricting defendant in the examination of proposed jurors and in denying challenges. Fragmentary portions, only, of the examinations appear in the abstract, and, of course, we cannot tell how restricted they were or what their scope was. From what does appear we cannot see any error in the rulings. But one of the jurors about whom complaint is made sat in the case, and he was clearly competent.

Another complaint is, that the court permitted the People to put hypothetical questions to medical experts, based upon the hypothesis that an operation had been performed with an instrument to produce an abortion. These questions called for opinions as to what the effect would be as to carrying up into the womb purulent and poisonous matter on the instrument and what results would be produced. The objection is that there was no foundation in the evidence for the supposed fact, and our opinion already expressed that the conclusion of fact embraced in these questions was warranted by the evidence and a proper inference from it, answers the objection. The evidence showed that the visit to Atlanta and to the office was for the purpose of an abortion; that it was in pursuance of an arrangement with the doctor;

that the method ordinarily used was by an instrument, and that an abortion followed.

It is objected that the court erred in admitting the entry on the hotel register. If there were any merit in the objection it would not be available, because the fact had been proved without objection. The hotel clerk had testified that she wrote on the register, "Leota Stelbacher, Bloomington, Illinois," and the proprietor had testified that she pointed out that name to him when she settled her bill. This was done without objection, and the fact was already proved.

It is also urged that the court erred in giving the fifth instruction asked by the People. It stated that the People were not bound to prove the exact time alleged in the indictment, and is admitted to be correct as a proposition of law. The supposed objection is, that it did not also tell the jury that the People must prove that the crime was committed in Logan county, and they might infer that it could be committed elsewhere. The nineteenth, twenty-seventh and thirty-ninth instructions given at the request of defendant informed the jury that in order to convict him the evidence must prove, beyond a reasonable doubt, that the crime was committed in Logan county. There could be no misunderstanding about that.

The ninth instruction given at the instance of the People is objected to, as assuming that an operation was performed upon the person of Minnie Bennett. That instruction merely defined the relation of one who, not being present, advises, assists or encourages the perpetration of a crime. Standing alone it might be subject to criticism; but there were a great many instructions requiring proof, beyond a reasonable doubt, of the fact that an abortion was produced, and particularly the thirty-third, thirty-sixth and thirty-eighth, given at the request of defendant, told the jury that they had no right to presume that an operation was performed, but that such fact must be proved beyond all reasonable doubt. In the light

of these instructions there could be no possible inference unfavorable to defendant arising from the language of the one objected to.

Other instructions are complained of on the ground that there was no evidence tending to prove that an operation was performed at Atlanta, and therefore no evidence on which to base them. We have disposed of the objection that there was no such evidence by holding that the evidence was sufficient to prove the fact.

Finally, complaint is made that the court modified three instructions given at the request of defendant, by including in the hypothesis upon which the jury were directed to find defendant not guilty, the fact that he did not aid or assist in the abortion. We do not find any error in the modification, and on a review of all the instructions it is very clear that the party justly entitled to complain is not the defendant, but the People. . The court gave fifty-seven instructions prepared by counsel for defendant, most of which ought to have been refused. Under the form of instructing the jury as to the law, the case was very fully argued on behalf of the defendant, and he has no cause for complaint.

The judgment is affirmed.          *Judgment affirmed.*